IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jarma Lee Dearman Farmer, | ) | C/A No.: 1:14-4898-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On August 29, 2011, Plaintiff protectively filed an application for DIB in which she alleged her disability began on December 1, 2010. Tr. at 107, 152–55. Her application was denied initially and upon reconsideration. Tr. at 112–14, 116–17. On July

12, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Kelly Wilson. Tr. at 65–106 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 18, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–40. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 30, 2014. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 71. She completed a master's degree in education. Tr. at 494. Her past relevant work ("PRW") was as a teacher. Tr. at 100. She alleges she has been unable to work since December 1, 2010. Tr. at 152.

2.     Medical History

On July 12, 2010, Plaintiff visited orthopedic surgeon Michael J. Stonnington, M.D. ("Dr. Stonnington"), for an annual post-operative visit. Tr. at 251. Dr. Stonnington noted that Plaintiff had undergone left unicompartmental knee arthroplasty four years earlier and had gone slalom skiing the day before without complications. *Id.* Plaintiff reported occasional left posterior knee pain, but stated she was otherwise doing well. *Id.* An x-ray of Plaintiff's left knee showed some patellofemoral degenerative changes, but was otherwise normal. Tr. at 252. Dr. Stonnington instructed Plaintiff to follow up regarding her left knee in one year. Tr. at 253.

Plaintiff presented to R. Shane Roberts, M.D. ("Dr. Roberts"), to establish treatment on November 19, 2010. Tr. at 342. She complained of possible arthritis in her bilateral fingers and hands and reported recent weight gain and a history of migraines. Tr. at 341–42. Dr. Roberts referred Plaintiff to a hand doctor for an evaluation of possible trigger finger and for lab work. *Id.*

On December 21, 2010, Plaintiff presented to Dr. Stonnington with a new complaint of right knee pain, following an injury. Tr. at 249. She stated she stepped up on a step and heard something pop in her knee. *Id.* She reported extreme pain, swelling, and stiffness. *Id.* Dr. Stonnington observed Plaintiff to have tenderness around her medial and lateral joint lines, but full range of motion ("ROM") without pain. *Id.* She was stable to varus and valgus stress at 30 degrees flexion and full extension. *Id.* Neurologic and circulatory exams were unremarkable. *Id.* Dr. Stonnington injected Plaintiff's right knee with a solution of Betamethasone and Marcaine, prescribed Naprelan and Lortab for pain, and referred Plaintiff for an MRI Tr. at 250.

On January 31, 2011, Plaintiff informed Dr. Stonnington that her right knee pain, swelling, and catching were affecting her daily activities. Tr. at 247. Dr. Stonnington noted Plaintiff had a moderate effusion in her knee, reduced ROM with pain on terminal flexion, and tenderness around her medial joint line. *Id.* Plaintiff had no skin, neurological, or circulatory abnormalities. *Id.* Dr. Stonnington noted that an MRI of Plaintiff's right knee revealed some signal changes consistent with bone bruising and some chondromalacia of the medial femoral condyle and patella and signal changes in the anterior horn of the medial meniscus, with a suggestion of a subtle linear component

3

extending to the inferior surface. *Id.* He assessed probable right knee medial meniscus tear and mild degenerative joint disease ("DJD") and scheduled Plaintiff for right knee arthroscopy and partial meniscectomy and chondroplasty. *Id.* Dr. Stonnington noted similar observations on February 21, 2011, and rescheduled Plaintiff's surgery. Tr. at 239.

Plaintiff underwent right knee arthroscopy and chondroplasty to her medial femoral condyle and patellofemoral joint on March 10, 2011. Tr. at 240. Dr. Stonnington discovered no meniscal tear. Tr. at 241.

Plaintiff participated in physical therapy between March 18 and April 29, 2011. Tr. at 466–91. She was discharged with a good prognosis and decreased pain in her right knee. Tr. at 466.

On April 18, 2011, Plaintiff reported to Dr. Stonnington that her knee was doing much better, but that she was experiencing some gastric distress from a medication. Tr. at 245. Dr. Stonnington observed Plaintiff to have full motion in her right knee with no signs of infection or swelling and to be neurovascularly stable with a well-healed incision. *Id.* He replaced Plaintiff's prescription for Naprelan with a prescription for Celebrex. *Id.*

Plaintiff presented to Dr. Roberts on April 19, 2011, and reported having been extremely tired. Tr. at 340. Dr. Roberts referred Plaintiff for lab work, x-rays, an electrocardiogram ("EKG"), and a 24-hour Holter monitor test. Tr. at 339.

On June 29, 2011, Plaintiff presented to Mark S. Sumida, M.D. ("Dr. Sumida"), with bilateral hand pain. Tr. at 372. She indicated that she worked part-time as a cashier

and cook and was active with arts and crafts. *Id.* She stated she began noticing pain while gripping in November 2010, which had worsened since she stopped taking Naprelan. *Id.* Dr. Sumida observed some swelling in Plaintiff's bilateral distal interphalangeal ("DIP") joints and some mild prominence of her proximal interphalangeal ("PIP") joints. *Id.* However, he indicated Plaintiff had no ulnar drift with her metacarpophalangeal ("MCP") joints bilaterally and no ligamentous instability, except for a left ring early swan neck deformity. *Id.* Plaintiff denied numbness and tingling. Tr. at 373. X-rays revealed minimal, diffuse DJD of the DIP and PIP joints. *Id.* Dr. Sumida prescribed Naprelan and an extension blocking splint for Plaintiff's PIP joint of her swan neck deformity. *Id.* He ordered lab tests to check for inflammatory markers, uric acid, and a rheumatoid profile. *Id.* He also indicated Plaintiff may require surgery in the future. *Id.*

Plaintiff presented to the emergency department at Athens Regional Medical Center on June 29, 2011, after having been injured in a motor vehicle accident ("MVA"). Tr. at 266. She complained of pain in her neck, chest, and bilateral feet. *Id.* An x-ray of Plaintiff's cervical spine indicated disc narrowing with spurring at C5-6. Tr. at 269. An x-ray of her right foot showed some calcaneal spurring, but no acute fracture. *Id.* An x-ray of her right knee showed mild joint space narrowing medially, but no fracture or dislocation. Tr. at 270.

Plaintiff followed up with Dr. Roberts the next day, and reported pain in her neck, bilateral knees, left side, and hip. Tr. at 336. Dr. Roberts prescribed Prednisone and ordered lab work. Tr. at 335–36.

Plaintiff saw Dr. Roberts on July 15, 2011, and reported severe migraines and nausea following the MVA. Tr. at 334. She complained of back pain and requested she be referred for an MRI and to a neurologist. *Id.*

On July 18, 2011, x-rays of Plaintiff's cervical spine revealed loss of lordotic curvature; moderate loss of disc space at C5-6, encroachment of vertebral foramina at C4-5, 5-6, and 6-7; osteoarthritis/DJD at C5-6; and a postural deformity. Tr. at 254.

An MRI of Plaintiff's right knee on July 19, 2011, showed an irregular signal pattern within the distal femoral condyle and femoral metaphysis suggestive of bony edema. Tr. at 260. It also showed evidence of degenerative changes of osteoarthritis and a grade II to III tear of the anterior horn of the medial meniscus. *Id.* There was evidence for strain of the medial collateral ligament complex and contusion of the anterior medial tibial plateau. Tr. at 260–61. An MRI of Plaintiff's cervical spine revealed an Arnold Chiari type-I malformation with the cerebellar tonsils extending below the level of the foramen magnum bilaterally; degenerative disc disease with a shallow bulging disc at C5-6; small bilateral uncal spurs at C5-6 with mild bilateral spur encroachment upon the neural foramina at C5-6; and a bulging disc at C6-7, greater to the left of midline and associated with a small leftward degenerative uncal spur at C6-7. An MRI of Plaintiff's thoracic spine showed a small leftward disc bulge at T2-3. Tr. at 264.

On July 22, 2011, Plaintiff reported right knee pain to Dr. Roberts and stated she was not sleeping well. *Id.* Dr. Roberts referred her to an orthopedic surgeon and a neurosurgeon. Tr. at 331.

Plaintiff presented to Eteri Bibileishvili, M.D. ("Dr. Bibileishvili"), on July 28, 2011, for headaches that started after her MVA. Tr. at 400–01. She reported recent weight gain, fatigue, weakness, night sweats, pain, double and blurred vision, nosebleeds, swollen legs/feet, nausea, morning stiffness, joint pain and swelling, muscle weakness, back pain, stiffness, tightness, headaches, dizziness, sensitivity or pain in hands, memory loss, anxiety, and depression. Tr. at 400–01. She reported stiffness in her neck, upper back, and between her shoulders. Tr. at 402. She stated she was having difficulty sleeping and turning her head to the sides. *Id.* She described her headaches as starting in the base of her skull and being associated with nausea, vomiting, photophobia, and phonophobia. *Id.* She indicated they occurred four to six times per week and lasted for up to 24 hours at a time. *Id.* Dr. Bibileishvili prescribed Elavil to prevent headaches and Imitrex to treat headaches. *Id.*

On August 23, 2011, Plaintiff complained of headaches to Dr. Roberts, who referred her to several specialists. Tr. at 329–30.

On August 24, 2011, Plaintiff presented to physical therapist Mark Fink ("Mr. Fink"), for an evaluation regarding cervicalgia and a problem with her left ring finger. Tr. at 450–52. Mr. Fink indicated Plaintiff required skilled rehabilitative therapy three times per week for four weeks. Tr. at 451–52. Plaintiff sporadically participated in physical therapy between August 24, 2011, and January 23, 2012. Tr. at 422–52.

Plaintiff followed up with Dr. Sumida on August 26, 2011, and reported that she injured her right knee in a car accident immediately after her last visit. Tr. at 374. Dr. Sumida observed Plaintiff to walk with an antalgic gait; to have medial and lateral joint

line tenderness; to have mild effusion and mild crepitation with ROM; and to be uncomfortable. *Id.* He reviewed the report from the MRI of Plaintiff's right knee and noted that Naprelan was not helping Plaintiff's finger symptoms or her knee pain. *Id.* Dr. Sumida administered an injection of Marcaine and Depo-Medrol to Plaintiff's right knee and referred her to a hand specialist. Tr. at 375.

Plaintiff followed up with Dr. Bibileishvili on August 29, 2011, for headaches. Tr. at 397. A neurological examination was normal. Tr. at 398. Plaintiff reported continued headaches and stated Elavil made her drowsy and unable to function during the day. Tr. at 399. Dr. Bibileishvili substituted Inderal for Elavil. *Id.*

On September 20, 2011, Plaintiff complained to Dr. Roberts of a wart on her left thumb, an injury to the fourth digit of her left hand, and a scaly ulceration on her right lower extremity. Tr. at 327. Dr. Roberts prescribed a splint for Plaintiff's left fourth digit and administered a B12 injection. *Id.*

Plaintiff followed up with Dr. Bibileishvili on September 29, 2011, regarding her headaches. Tr. at 393. Dr. Bibileishvili observed no abnormalities on neurological examination. Tr. at 394. Plaintiff reported attention, concentration, and memory problems, but noted some improvement in her headaches. Tr. at 395. Plaintiff complained that Inderal caused drowsiness when taken in the morning and insomnia when taken before bed. *Id.* Dr. Bibileishvili discontinued Inderal and prescribed Depakote. *Id.*

On October 11, 2011, Plaintiff followed up with Dr. Roberts regarding lab tests. Tr. at 326. She reported fatigue and complained that her migraines were particularly bad during the previous week. *Id.*

Plaintiff called Dr. Bibileishvili's office on October 13, 2011, and reported that her headaches had increased on Depakote. Tr. at 391. Dr. Bibileishvili prescribed Topamax and instructed Plaintiff to discontinue Depakote. *Id.*

Plaintiff followed up with Dr. Bibileishvili on October 27, 2011, regarding her headaches. Tr. at 389. Dr. Bibileishvili observed no abnormalities on neurological examination. Tr. at 390. Plaintiff indicated that Topamax had been very helpful and that she had experienced no headaches since she began taking it. Tr. at 391. She reported continued attention and concentration problems. *Id.* Dr. Bibilishvili refilled Plaintiff's medications and instructed her to follow up in two months. *Id.*

Plaintiff followed up with Dr. Sumida on November 17, 2011. Tr. at 376. She complained of some pain in her right knee, but demonstrated good ROM. *Id.* She was particularly concerned with her left ring finger. *Id.* Dr. Sumida indicated Plaintiff had not yet seen a hand specialist and again recommended she do so. *Id.*

Plaintiff presented to Brian Smith, M.D. ("Dr. Smith"), on November 22, 2011, with a complaint of drooping and a swan neck deformity in her left ring finger and locking of her right thumb. Tr. at 367. Dr. Smith observed Plaintiff to have a 40 degree extension lag of the DIP joint in her left ring finger and 10 degrees of hyperflexion of her PIP joint. Tr. at 368. He noted tenderness over the A1 pulley of Plaintiff's right thumb with triggering with flexion and extension. *Id.* X-rays showed normal joint space at the DIP and PIP joints with a mallet finger stance and compensatory hyperextension of the PIP joint for early swan neck deformity with prominence of a distal phalanx extension lag. *Id.* He diagnosed left ring finger mallet deformity with early hyperextension of the

PIP joint and right trigger thumb. *Id.* Dr. Smith recognized that splinting had been unsuccessful and that the next step was to proceed with a left ring finger DIP pinning with extensor retinacular tendon graft to the extensor tendon at the DIP joint of the ring finger and a right trigger thumb cortisone injection. Tr. at 368–69.

On November 29, 2011, state agency physician Jayant Desai, M.D. ("Dr. Desai"), assessed Plaintiff as having the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance; occasionally climb ramps/stairs/ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl; and occasionally reach overhead with the bilateral arms. Tr. at 344–50.

Plaintiff presented to the emergency room at Athens Regional Medical Center on December 5, 2011, after she cut her right hand while washing dishes. Tr. at 500. She received prescriptions for Keflex and Ultram and was instructed to follow up with her physician. Tr. at 502.

Plaintiff presented to Van S. Monroe, M.D. ("Dr. Monroe"), for a cardiac consultation on December 8, 2011. Tr. at 352. Dr. Monroe noted that Plaintiff had a left bundle branch block of unknown etiology. Tr. at 353. He recommended non-invasive stress testing and echocardiography to evaluate Plaintiff's aortic area murmur and prescribed medication for hypertension. *Id.*

Plaintiff also followed up with Dr. Sumida on December 8, 2011. Tr. at 377. She reported a recent slip-and-fall that resulted in reinjury of her right knee. *Id.* Dr. Sumida

observed Plaintiff to be stable to varus and valgus stress, but to have some tenderness over the MCL and pain in the medial compartment anteriorly and with McMurray, Steinmann, and Bohler tests. *Id.* He indicated Plaintiff likely had a tear in the anteromedial horn of her right meniscus, prescribed a hinged knee brace, and indicated Plaintiff would likely require knee surgery after her hand surgery. *Id.*

Echocardiography on December 16, 2011, showed normal left ventricular size and systolic function, but indeterminate diastolic function. Tr. at 354. Ondrej Lisy, M.D., Ph. D., indicated that abnormal ventral septal motion was likely due to a noted conduction abnormality. *Id.* A stress test showed no ischemia and a post-infusion left ventricular ejection fraction of 49 percent. Tr. at 356. Arthur A. Kort, M.D., interpreted the stress test to suggest an overall low cardiac risk from surgery. *Id.*

Plaintiff followed up with Dr. Bibileishvili on December 21, 2011. Tr. at 385. Dr. Bibileishvili observed no abnormalities on neurological examination. Tr. at 386. Plaintiff stated her headaches were improved with Topamax and Imitrex, but that she had developed a bad headache that day. Tr. at 387. She *Id.* She complained of off-and-on problems with attention and concentration. *Id.* Dr. Bibileishvili increased Plaintiff's Topamax dosage to 50 milligrams twice daily. *Id.*

Plaintiff followed up with Dr. Monroe on January 11, 2012. Tr. at 357–58. Dr. Monroe indicated Plaintiff was "an acceptable risk for surgical procedure as planned." Tr. at 358. He counseled Plaintiff on weight loss, continued her statin therapy, and prescribed Lisinopril for hypertension. *Id.*

On January 25, 2012, Plaintiff complained to Dr. Smith that her left ring mallet finger had worsened and that her right trigger thumb remained symptomatic. Tr. at 365. Dr. Smith observed Plaintiff to have tenderness in the A1 pulley; a 50 degree extension lag of the DIP joint of her left ring finger; and a 10 degree hyperextension of her PIP joint. *Id.* He planned to proceed with surgery. Tr. at 366.

On February 1, 2012, Dr. Smith performed a right trigger thumb release and pinned Plaintiff's left ring finger at her DIP joint and extensor tendon. Tr. at 364, 370–71.

Plaintiff followed up with Dr. Smith on February 7, 2012. Tr. at 363. Dr. Smith observed Plaintiff to be somewhat resistant to bending the PIP joint of her ring finger. *Id.* He recommended Plaintiff work on home exercises to improve her PIP ROM and wait six to eight weeks before undergoing knee surgery. *Id.*

Plaintiff also followed up with Dr. Sumida on February 7, 2012. Tr. at 378. He noted that Plaintiff was recovering from recent hand surgery and still had tenderness over her medial joint line. *Id.* Plaintiff complained of pain when ascending and descending stairs and stated she was unable to ambulate without a brace. *Id.* Dr. Sumida indicated Plaintiff could not undergo knee surgery until she was able to ambulate with crutches with her upper extremities. *Id.*

Plaintiff followed up with Dr. Smith on February 20, 2012, and reported a decrease in hand spasms. Tr. at 507. Plaintiff had good right thumb ROM and no evidence of wound infection. *Id.* Dr. Smith removed Plaintiff's sutures on the right and instructed Plaintiff to massage her left hand with Vitamin E lotion, to wear a splint, and to clean around the pin site with peroxide. *Id.*

Plaintiff presented to Dr. Bibileishvili on February 21, 2012, regarding her headaches. Tr. at 381, 382. Dr. Bibileishvili observed Plaintiff to have normal motor strength and sensation and a steady gait. Tr. at 382. Plaintiff indicated Imitrex was helpful, but that that Topamax was losing its effectiveness. Tr. at 383. Dr. Bibileishvili noted that Plaintiff had not started the increased dosage of 50 milligrams of Topamax twice daily. *Id.* He recommended Plaintiff take the increased dose of Topamax; continued her prescription for 100 milligrams of Imitrex, as needed; and referred her for an MRI of her brain. *Id.*

Plaintiff followed up with Dr. Roberts on February 29, 2012, to discuss a request for records. Tr. at 407. Plaintiff indicated to Dr. Roberts that she had applied for disability. *Id.* Dr. Roberts instructed Plaintiff to continue the treatment plans of Drs. Monroe, Sumida, Bibileishvili, and Smith and provided Plaintiff a work excuse that was "ongoing pending completion of treatment plans of specialists." Tr. at 408.

On March 13, 2012, Dr. Smith observed Plaintiff to have good thumb ROM and to be able to bend the left ring PIP joint to 90 degrees. Tr. at 508. Dr. Smith removed the pin without difficulty, fit Plaintiff for a new splint, and instructed her to begin weaning from the splint for one hour per day. *Id.*

Plaintiff also visited Dr. Sumida on March 13, 2012, and reported continued popping and clicking in her knee. Tr. at 755. Dr. Sumida observed Plaintiff to have medial joint line tenderness, but improved stability. *Id.* He recommended Plaintiff participate in physical therapy for quad and hamstring strengthening. *Id.* He indicated Plaintiff had an MCL sprain and a possible recurrent medial meniscal tear and that the

injuries needed to be sorted out before they could consider any further invasive procedures. *Id.*

On March 28, 2012, Mr. Fink again evaluated Plaintiff and indicated she required skilled rehabilitative therapy twice a week for four weeks. Tr. at 416–17. Plaintiff's pain was noted to be a six of 10 and she had a moderate degree of right knee instability with occasional locking. Tr. at 418. Her gait was mildly antalgic. Tr. at 419. Plaintiff's knee flexion and extension were decreased bilaterally, with flexion at +4/5 bilaterally and extension at +4/5 on the left and 4/5 on the right. *Id.* The temperature of the lateral aspect of her right knee was mildly increased. *Id.* She had medial joint line tenderness with palpable catching during flexion and extension and was tender to palpation of the anterolateral joint line. *Id.*

Plaintiff returned to Bench Mark Physical Therapy for continued care of her right knee on April 9 and 11, 2012. Tr. at 563–68. She moved from the area and was discharged from physical therapy on July 9, 2012. Tr. at 569–71.

Plaintiff presented to Jacqueline L. Williams, Ph. D., HSP, NCSP ("Dr. Williams"), for a consultative psychological evaluation on April 12, 2012. Tr. at 493–99. Dr. Williams observed Plaintiff to be clean and appropriately-dressed; to be overweight; to have a normal posture; and to ambulate with a slightly exaggerated gait. Tr. at 493. Plaintiff reported decreased appetite, sleeping for only three hours at night, and frequent worry. Tr. at 494. She indicated she had frequent crying spells, decreased energy, and little interest in things she used to enjoy. Tr. at 495. Dr. Williams assessed Plaintiff's intellectual functioning to be average. *Id.* Plaintiff described some problems

14

remembering, and Dr. Williams observed that Plaintiff showed evidence of mild to moderate impairment in her short-term, long-term, and remote memory and her ability to sustain concentration. Tr. at 496. Plaintiff's mood and affect were sad and depressed. *Id.* Dr. Williams indicated Plaintiff gave reasonable effort and showed no signs of malingering. *Id.* Plaintiff reported that others managed her medications and finances. Tr. at 497. She indicated her stepdaughter accompanied her when she visited the grocery store. *Id.* She stated she could prepare simple meals and assist her stepchildren in preparing meals, but was unable to prepare foods she used to prepare because of difficulty grasping. *Id.* She indicated she could wipe things with a cloth and fold laundry, but denied other cleaning because of difficulty standing and getting on her knees. *Id.* She stated she could stand for about an hour at a time. *Id.* She indicated she was no longer able to paint, draw, or do calligraphy because of cramping in her hands. *Id.* Dr. Williams indicated Plaintiff had moderate impairment in her ability to relate socially and marked impairment in her ability to adapt to change, but was able to follow written and spoken instructions. *Id.* She diagnosed major depressive disorder, recurrent, moderate, without psychotic features. Tr. at 497–98.

An MRI of Plaintiff's brain on April 12, 2012, indicated no acute abnormality and no change in the Arnold Chiari type-I malformation since July 2011. Tr. at 506.

On April 17, 2012, Plaintiff reported to Dr. Smith that she had weaned down on use of the splint as recommended and that she continued to wear it off-and-on at night. Tr. at 509. Dr. Smith noted a 20 degree extension lag of Plaintiff's DIP joint and a five

degree hyperextension of her PIP joint. *Id.* He indicated Plaintiff had come out of the splint too soon and that she should continue wearing it at night. *Id.*

On April 17, 2012, Plaintiff discussed with Dr. Sumida the option of right knee arthroscopy. Tr. at 756. Dr. Sumida explained to Plaintiff the risks and benefits of surgery and informed her that an arthroscopy would not cure her arthritis. Tr. at 756–57. He suggested Plaintiff undergo diagnostic and therapeutic knee arthroscopy with debridement of a meniscal tear, if a tear were discovered. *Id.*

Plaintiff followed up with Dr. Bibileishvili on April 19, 2012, and reported feeling more tired than usual, but experiencing an improvement in her headaches on the increased dosage of Topamax. Tr. at 524. Plaintiff complained of severe pain in the base of her skull and nausea after coughing, sneezing, or blowing her nose. *Id.*

State agency medical consultant Amin Azimi, Ed. D. ("Dr. Azimi"), completed a psychiatric review technique on April 23, 2012, and indicated Plaintiff was moderately limited with respect to the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting. Tr. at 525–26. He indicated Plaintiff could perform simple and detailed tasks over a full workweek; maintain concentration, persistence, and pace for low-level detailed tasks over a normal workday; interact infrequently or one-on-one with

16

the general public and meet basic social demand in a work setting; and adapt to gradual or infrequent changes in the workplace. Tr. at 527. Dr. Azimi indicated Plaintiff had major depressive disorder, recurrent and moderate, without psychotic features and assessed mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 529–42.

On April 25, 2012, state agency consultant Kanika Chaudhuri, M.D. ("Dr. Chaudhuri"), reviewed the record and assessed Plaintiff to be restricted as follows for the period 12 months after January 21, 2013: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders/ropes/scaffolds. Tr. at 544–51. Dr. Chaudhuri indicated Plaintiff was limited as follows, for the period from her alleged onset date until the month of the determination: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps/stairs/ ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl; frequently lift overhead with the bilateral upper extremities; and frequently handle and finger with the bilateral upper extremities. Tr. at 552–61.

Plaintiff followed up with Dr. Stonnington on July 23, 2012, and reported pain in her right knee and left finger following the MVA. Tr. at 574. She indicated her right knee

pain markedly affected her daily activities. *Id.* Dr. Stonnington observed Plaintiff to have a 20 degree extensor lag at the DIP joint of her left ring finger and to have active flexion to about 45 degrees. Tr. at 575. Plaintiff demonstrated tenderness around the medial joint line of her right knee. *Id.* Dr. Stonnington indicated Plaintiff had right knee DJD that was exacerbated by the MVA and a possible meniscus tear that was directly contributed to by the MVA. *Id.* He indicated Plaintiff also had a residual lack of extension of her left ring finger that was directly related to the MVA. *Id.* He administered an injection of Marcaid and Betamethasone, referred Plaintiff for physical therapy, prescribed Celebrex and Lortab, and instructed Plaintiff to follow up in two months. *Id.*

Plaintiff presented to Michele Lyon, M.D. ("Dr. Lyon"), for headache treatment on July 31, 2012. Tr. at 586. She indicated Topamax had reduced her headaches from between 10 and 12 per month to approximately eight. *Id.* She indicated Topamax resulted in side effects that included decreased energy and irritability. *Id.* Plaintiff indicated she had recently decreased her daily Topamax dosage to 75 milligrams, which had resulted in increased headaches. *Id.* Dr. Lyon observed Plaintiff to have normal motor strength, coordination, and reflexes and unremarkable gait. *Id.* Dr. Lyon indicated Plaintiff should continue Topamax, but increase her daily dosage back to 100 milligrams. Tr. at 588. She also prescribed Relpax and Cambia for headache relief. *Id.* Dr. Lyon discussed with Plaintiff her diagnosis of Arnold Chiari malformation, type I, and indicated Plaintiff would require serial neurological examinations in the future. *Id.*

On August 8, 2012, Dr. Stonnington set forth specific limitations on a physical capacities evaluation form. Tr. at 579–80.

Plaintiff participated in eight physical therapy sessions at South Aiken Physical Therapy, LLC from August 6 to September 12, 2012. Tr. at 786.

Plaintiff followed up with Dr. Lyon on September 5. Tr. at 589. She indicated she was doing better with the increased dosage of Topamax. *Id.* She stated Relpax was less effective than Imitrex, and Dr. Lyon prescribed Imitrex at Plaintiff's request. Tr. at 588–89.

Plaintiff visited Health Source Chiropractic and Progressive Rehab on September 20, 2012, and reported pain in her neck, shoulders, and back. Tr. at 602. She complained of symptoms that included weakness, fatigue, night sweats, nervousness, concentration loss, irritability, depression, memory loss, loss of sleep, headache, apprehension, muscle pain, muscle weakness, muscle cramps, joint stiffness, joint tenderness, back pain, joint swelling, stiff neck, soreness, weak grip, and numbness. Tr. at 604.

Plaintiff followed up with Dr. Stonnington on October 9, 2012. Tr. at 789–92. She reported that her right knee symptoms were markedly affecting her daily activities. Tr. at 791. She explained that she had difficulty walking short distances and climbing stairs and indicated physical therapy had increased her pain. *Id.* On physical exam, Dr. Stonnington found Plaintiff to have pain on flexion, tenderness around the joint lines in her right knee, and crepitus on ROM. Tr. at 792. He recommended right total knee arthroplasty and scheduled Plaintiff for surgery. *Id.*

Dr. Stonnington referred Plaintiff to Edward Askew, III, M.D. ("Dr. Askew"), for an internal medicine consultation on October 12, 2012. Tr. at 799. Plaintiff's blood pressure was elevated at 161/75, but the physical examination was otherwise normal. Tr.

at 800–01. Dr. Askew provided impressions of uncontrolled hypertension due to Plaintiff's noncompliance and asymptomatic bacteriuria. Tr. at 801. He recommended Plaintiff proceed with surgery as planned, take medication for deep venous thrombosis prophylaxis, and take Ciprofloxacin for bacteriuria and Lisinopril for hypertension. *Id.*

On October 18, 2012, Dr. Stonnington performed right total knee arthroplasty. Tr. at 803–04.

Plaintiff presented to Dr. Stonnington for a post-operative follow up visit on November 13, 2012. Tr. at 807. Dr. Stonnington indicated Plaintiff was making good progress with physical therapy. *Id.* He did not observe Plaintiff to have any swelling or signs of infection and he noted that she was ligamentously and neurovascularly stable. Tr. at 808.

Plaintiff next followed up with Dr. Stonnington on November 30, 2012. Tr. at 810. She expressed no complaints and indicated she was doing well with physical therapy and was happy with the results of her surgery. *Id.* Dr. Stonnington noted Plaintiff had a normal gait, a well-healed incision, and no swelling or signs of infection. Tr. at 811. He refilled Plaintiff's prescriptions for Lortab, Flexeril, and Naproxen and provided five refills because Plaintiff was going back to South Carolina from Mississippi. *Id.*

Plaintiff presented to the emergency department at Aiken Regional Medical Centers on December 14, 2012, for right knee pain, shoulder pain, and neck pain, following another MVA. Tr. at 758. Plaintiff had contusions on her upper and lower extremities, but no other abnormalities were noted. Tr. at 770–71.

Plaintiff followed up with Dr. Lyon on December 19, 2012, and reported having fewer than nine migraine headaches per month. Tr. at 610. She indicated she continued to have acute swelling in her right knee. *Id.* Dr. Lyon observed Plaintiff to have decreased ROM on lateral head turn and ear-to-shoulder turn. *Id.* She noted a trigger point in Plaintiff's left cervical paraspinals. *Id.*

Plaintiff presented to Dr. Stonnington on December 31, 2012, and informed him that she had recently been in another MVA. Tr. at 814. She complained of lateral-sided knee pain following the accident, but stated it was improving. *Id.* Dr. Stonnington noted Plaintiff's surgical wound was well-healed and that she had a normal gait. Tr. at 815. He indicated Plaintiff was ligamentously stable in her right knee and had no swelling, but was tender over her iliotibial band. *Id.* Dr. Stonnington indicated Plaintiff had no evident motor deficit in her right lower extremity and no circulatory compromise. *Id.* He assessed a contusion of Plaintiff's right total knee arthroplasty and indicated that Plaintiff would have symptoms for the next couple of months, but would completely recover. *Id.* He suggested Plaintiff settle with the insurance company regarding the December 2012 MVA because she should have no long-term sequela. *Id.*

On February 12, 2013, Plaintiff indicated to Dr. Lyon that her headaches had increased in recent months because of stress related to her family situation. Tr. at 819. She indicated her gynecologist had prescribed Cymbalta, which helped with irritability and depression, but she requested other medication because she could no longer afford the Cymbalta. *Id.* Dr. Lyon counseled Plaintiff on behavioral management and suggested

she pursue family counseling. *Id.* She refilled Plaintiff's prescriptions for Topamax and Imitrex for headaches and prescribed Lexapro for depression. *Id.*

On March 12, 2013, Plaintiff reported to Dr. Lyon that the Lexapro was ineffective and that she desired to go back on Cymbalta. Tr. at 821. She indicated her migraines were fairly well-controlled on Topamax, as long as she reduced her family stress. *Id.*

Plaintiff presented to Dr. Lyon "urgently for evaluation of wrist pain" on April 30, 2013. Tr. at 822. Dr. Lyon observed Plaintiff to have decreased sensation to pinprick in the first, second, and third digits of her bilateral hands. *Id.* She assessed suspected carpal tunnel syndrome ("CTS") and prescribed nocturnal wrist splints and a trial of Naprelan 500 milligrams. *Id.*

On May 30, 2012, Plaintiff indicated to Dr. Lyon that her wrist pain had improved with Naprelan and use of wrist splints. Tr. at 831. She reported some residual wrist pain and indicated she sometimes used ice on her wrists. *Id.* Dr. Lyon indicated she would hold off on electrodiagnostic testing and reevaluate Plaintiff's wrist pain in three months. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on July 12, 2013, Plaintiff testified she retired from Greene County, Mississippi, where she worked for over 26 years as a teacher. Tr. at 72. She indicated her husband was transferred from Mississippi to Kentucky and that she worked as a full-time

teacher in Kentucky until her husband was transferred again. Tr. at 71. She stated she last worked part-time as a substitute teacher in 2010. Tr. at 71–72. She later indicated she worked as a teacher for a total of 28 to 29 years. Tr. at 96.

Plaintiff testified she had pain in her hands and knees, migraines, and memory loss. Tr. at 73. She stated she experienced good and bad days. *Id.* She indicated she made lists to remember things, elevated her legs, and had difficulty standing and walking. *Id.*

Plaintiff testified she had a history of total knee replacement on the right and partial knee replacement on the left. Tr. at 73. She indicated her swelling reduced after she underwent right knee surgery the previous October. Tr. at 74. She endorsed continued pain in her bilateral knees and indicated she would likely require further left knee surgery. *Id.* Plaintiff testified her hand pain began a couple of years earlier and recently worsened. Tr. at 77, 92. She indicated that her hands were numb and that she had difficulty gripping and holding items, writing, and opening containers. Tr. at 78. She stated her right hand was worse than her left and that she had been diagnosed with carpal tunnel syndrome and prescribed wrist splints. Tr. at 75, 77. She indicated she took Naproxen, Lortab, and Flexeril two to three times daily for knee and hand pain. Tr. at 75. She stated she elevated her legs daily and that she had to elevate them for approximately eight hours a day on one to two days per week. Tr. at 79.

Plaintiff testified she had one to three migraines per week that were exacerbated by poor sleep and worry. Tr. at 76. She indicated her migraines lasted from one to three days at a time and were accompanied by vomiting. *Id.* She stated she was prescribed

Imitrex and Topamax for migraines and that Imitrex relieved her symptoms most of the time. Tr. at 77.

Plaintiff testified she could stand for one to two hours before she needed to sit. Tr. at 80. However, she indicated that if she stood for one to two hours, she required the use of her cane and developed swelling that prevented her from standing and walking for extended periods for the remainder of the day. Tr. at 92–93. She stated she needed to sit for a couple of hours after standing for an extended period, but had difficulty bending her legs while sitting. Tr. at 80. Plaintiff stated her cane was prescribed by her doctor prior to her right knee surgery, and that her doctor indicated she should continue to use it after the surgery. Tr. at 80–81. She testified she was unable to sit for long periods without having her neck supported. Tr. at 93. She indicated she alternated between a recliner, her couch, and her bed during a typical day. Tr. at 94. She stated she typically kept her legs stretched out while sitting. Tr. at 95. She denied being able to squat, stoop, and climb stairs. Tr. at 97.

Plaintiff testified she began taking Cymbalta for depression several months earlier. Tr. at 82. She indicated her memory loss was related to her depression. Tr. at 81. She stated she stayed home most of the time because of her depression. *Id.* She denied side effects from her medications. Tr. at 95.

Plaintiff stated she lived in a home with her husband and 17-year-old stepdaughter. Tr. at 84. She indicated she had a driver's license, but had difficulty driving because she was limited in her abilities to turn her head and neck, to grip the steering wheel, and to drive long distances. Tr. at 84–85. She testified her stepdaughter sometimes

helped her dress and apply makeup. Tr. at 85. She stated she was able to dust furniture, prepare some meals, and fold clothing. Tr. at 87–88. She indicated she spent time during a typical day reading and watching her dogs. Tr. at 88.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Otis Pearson reviewed the record and testified at the hearing. Tr. at 99–106. The VE categorized Plaintiff's PRW as a secondary school teacher, *Dictionary of Occupational Titles* ("*DOT*") number 092.227-010, as light and skilled with a specific vocational preparation ("SVP") of seven. Tr. at 100. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but could only perform frequent handling and fingering with the bilateral upper extremities; occasional overhead reaching with the bilateral upper extremities; occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; could perform simple tasks and low-level detailed tasks, but no complex tasks; could have superficial contact with the public, but no customer service sales or counter work, etc.; and could adapt to changes in the work setting that were introduced gradually. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 101. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs with an SVP of two as a mail clerk, *DOT* number 209.687-026, with 1,400 positions in the state and 119,000 positions in the national economy; an office helper, *DOT* number 239.567-010, with 1,050 positions in the state and 85,000 positions in the national economy; and a

25

garment sorter, *DOT* number 222.687-014, with 2,700 positions in the state and 229,000 positions in the national economy. *Id.* The ALJ asked if the Plaintiff had acquired skills in her PRW as a teacher that were transferable to the sedentary exertional level. *Id.* The VE testified that she had not. *Id.*

Plaintiff's attorney asked the VE to assume the individual was limited to light work, but would require use of a cane while standing. Tr. at 102–03. He asked if that would eliminate the jobs identified in response to the ALJ's hypothetical. Tr. at 103. The VE testified that it would because use of the cane while standing would prevent the individual from using both hands to perform the jobs. *Id.*

Plaintiff's attorney next asked the VE to assume the individual was limited to sitting, standing, and walking for two hours each; occasionally lifting; occasionally carrying up to 10 pounds; occasionally stooping and bending; no kneeling, crouching, twisting, or climbing stairs; required position changes from sitting to standing; must lie down two to three times per day due to head, neck, and knee pain; could occasionally reach over the shoulder, handle, finger, and feel; could not repetitive use her bilateral feet; and must avoid extreme light, loud noise, and excessive contact with the public or coworkers; must elevate her legs 50 percent of the time; and would require a cane while standing and walking. Tr. at 104. He asked if those restrictions would preclude any competitive work activity. *Id.* The VE testified the individual would be able to perform no jobs. *Id.* He specified that a need to lie down two to three times per day, a limitation to occasional handling and fingering, and a need to elevate the legs for 50 percent of the time would each independently be preclusive of competitive work activity. Tr. at 104–05.

26

He further explained that a combination of sitting, standing, and walking for six hours per day would be less than full-time, competitive employment. Tr. at 105.

Plaintiff's attorney asked the VE if work activity would be precluded if the individual had to miss one day of work per week due to migraine headaches. *Id.* The VE testified that it would and that three or more absences per month would be considered excessive. *Id.*

2.    The ALJ's Findings

In her decision dated November 18, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since December 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe combination of impairments: degenerative joint disease of the knees status post bilateral knee replacement procedures, degenerative disc disease of the cervical and thoracic spine, Arnold Chiari malformation in the brain with headaches, carpal tunnel syndrome, deformities of the right thumb and left ring finger status post-surgical repair, obesity, depression, and anxiety (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can only perform frequent handling and fingering with her bilateral upper extremities and occasionally reach overhead with her arms. The claimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. The claimant can perform simple and low level detailed tasks, but no complex tasks. She can have superficial contact with public, but should engage in no customer service, sales, or counter work. The claimant can adapt to gradually introduced or infrequent changes in the work place.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on November 11, 1960 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2010, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 20–33.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly analyze and weigh the medical opinion evidence;

2)    the ALJ did not adequately assess Plaintiff's credibility; and

3)    the ALJ did not explain her findings regarding Plaintiff's RFC, as required by SSR 96-8p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Medical Opinions

Plaintiff argues the ALJ did not analyze the treating physicians' opinions in accordance with the provisions of 20 C.F.R. § 404.1527(c), SSR 96-2p, and SSR 96-5p. [ECF No. 14 at 20]. The Commissioner maintains that the ALJ considered the treating physicians' opinions and that her decision to give them minimal weight was supported by substantial evidence. [ECF No. 16 at 13, 15].

ALJs "must always carefully consider medical source opinions about any issue." SSR 96-5p. Treating physicians' opinions are presumed to carry controlling weight as long as they are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). If an ALJ declines to accord controlling weight to a treating physicians' opinion because it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record, all of the medical opinions of record must be weighed based on the factors set forth in 20 C.F.R. § 404.1527(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent

of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Not only does 20 C.F.R. § 404.1527(c) set forth factors that must be considered, it also guides ALJs in weighing those factors. Even if the record does not support according controlling weight to a treating source's opinion, the treating source's opinion generally carries more weight than any other opinion evidence in the record. 20 C.F.R. § 404.1527(c)(2). Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings are entitled to greater weight than unsupported and unexplained opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[3] Furthermore, ALJs should accord greater weight to opinions from specialists with respect to medical issues related to their particular areas of specialty than to physicians' opinions regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5). Finally, ALJs should consider any additional factors relevant to the

---

[3] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

particular case that tend to support or contradict medical opinions in the record. 20 C.F.R. § 404.1527(c)(6).

"[A]n express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." *Hendrix v. Astrue*, C/A No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court is not to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

a.     Dr. Stonnington's Opinion

Dr. Stonnington completed a physical capacities evaluation form on August 8, 2012, and indicated Plaintiff was limited as follows: sit for two hours at a time and for two hours during an eight-hour workday; stand and walk for no time during an eight-hour workday; occasionally lift and carry one to 10 pounds; never lift and carry over 10 pounds; occasionally push/pull one to 10 pounds; never push/pull over 10 pounds; occasionally stoop (bend); never kneel, crouch, twist, or climb stairs; must shift positions at will from sitting, standing, or walking; must lie down two to three times per day due to head, neck, and knee pain; occasionally reach in all directions; no repetitive use of bilateral feet; able to repetitively use the bilateral hands; elevate legs for 50 percent of an eight-hour day; and requires use of a cane due to severe DJD in knees. Tr. at 579–80.

However, on December 31, 2012, Dr. Stonnington indicated that Plaintiff would experience symptoms for the next couple of months, but would completely recover. Tr. at 815. He recommended Plaintiff settle with the insurance company regarding her December 2012 MVA because "she should have no long-term sequela." *Id.*

Plaintiff argues the ALJ did not adequately consider Dr. Stonnington's opinions. [ECF No. 14 at 23]. She specifically maintains that the ALJ's failure to consider Dr. Stonnington's indication that she required a cane to ambulate caused the ALJ to erroneously find she was capable of performing light work. *Id.* She contends the ALJ misinterpreted Dr. Stonnington's December 2012 opinion that she should settle with her insurance company over a MVA because she would completely recover and have no long-term sequelae. *Id.* at 24. She argues the ALJ did not apply the factors in 20 C.F.R. § 404.1527(c) in evaluating Dr. Stonnington's opinion. *Id.* at 25.

The Commissioner argues the ALJ properly attributed little weight to Dr. Stonnington's opinions because they were unsupported by and inconsistent with his treatment notes and the record as a whole. [ECF No. 16 at 13]. She maintains that the ALJ accepted that Plaintiff was limited to some degree, but that she did not find Plaintiff was limited to the extent Dr. Stonnington indicated in his statements. *Id.* at 14.

The ALJ wrote the following regarding Dr. Stonnington's opinions:

I have considered both of Dr. Stonnington's opinions in my assessment. Dr. Stonnington's December 2012 opinion suggests that his original opinion in August 2012 was for a temporary disability that he expected would improve after surgery. I noted that when Dr. Stonnington examined the claimant in July 2012, he noted no major deficits in range of motion of the right knee, no effusion, a stable knee, and no motor deficit (Exhibit 22F, p. 4). Physical findings were not significantly different in December 2012,

when he concluded the claimant would have a complete recovery (Exhibit 41F, p. 29). Given this evidence, I have given minimal weight to both of Dr. Stonnington's opinions. The two are inconsistent with each other. Instead, I have looked at the evidence as a whole, as well as the testimony, in making my decision regarding functional abilities.

Tr. at 31.

The undersigned recommends the court find the ALJ failed to adequately consider Dr. Stonnington's August 2012 opinion statement. As an initial matter, the ALJ specifically neglected to include in her recitation of the relevant portions of Dr. Stonnington's opinion, the suggestion that Plaintiff required use of a cane or other assistive device when engaging in occasional standing/walking. *Compare* Tr. at 30, *with* Tr. at 580. Although the Commissioner argues that the record did not document that Plaintiff regularly ambulated with a cane or include physical findings that suggested a cane was necessary, the ALJ was presented with a specific statement from Plaintiff's treating physician that indicated she required an assistive device to ambulate. Dr. Stonnington's statement was supported by Plaintiff's testimony, and Plaintiff's counsel raised the issue of Plaintiff's use of an assistive device in his hypothetical questions to the VE, which placed the ALJ on notice that this portion of Dr. Stonnington's opinion was particularly relevant. *See* Tr. at 80–81, 102–03. While the ALJ concluded that Plaintiff did not meet Listing 1.02 because the record contained "no evidence that the claimant requires the use of a handheld device that limits the functioning of both upper extremities," she never acknowledged evidence in the record that Plaintiff needed a cane or other assistive device that limited the functioning of one upper extremity. *See* Tr. at 21. The court could likely excuse the ALJs failure to recite the specific limitation as harmless

error if there were evidence that she considered the proposed limitation elsewhere in the decision, but there was no such evidence, and the court cannot excuse the ALJ's error based on the Commissioner's post hoc rationalization. *See Hall v. Colvin*, C/A No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, C/A No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. March 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Pursuant to SSR 96-2p, the ALJ must give good reasons for the weight given to the treating source's medical opinion and the notice of decision must contain specific reasons for the weight given to the treating source's opinion. Therefore, because the ALJ neglected to address Dr. Stonnington's indication that Plaintiff required an assistive device to ambulate, the undersigned recommends the court find that she failed to give good reasons for rejecting that portion of Dr. Stonnington's opinion. *See Hamlin v. Colvin*, C/A No. 8:12-3601-RMG-JDA, 2014 WL 587464, at *14 (D.S.C. Jan. 23, 2014), adopted by 2014 WL 588073 (D.S.C. Feb. 14, 2014) (finding that where the record contained conflicting evidence, including a physician's opinion, regarding whether the plaintiff's cane was medically necessary, the ALJ's lack of discussion as to the plaintiff's use of a cane in the decision did "not allow the Court to track the ALJ's reasoning and be assured that all record evidence was considered, and to understand how the ALJ resolved conflicts in the evidence").

The ALJ concluded that Dr. Stonnington's August 2012 and December 2012 opinions were inconsistent, but a review of the record suggests that the ALJ failed to consider that Dr. Stonnington was providing opinions about the long-term effects of different injuries. A review of Dr. Stonnington's December 31, 2012, treatment note reveals that Plaintiff consulted with him regarding whether she should settle a claim from the December 14, 2012, MVA. Tr. at 814. Plaintiff complained of lateral-sided knee pain following the accident, but indicated it was improving. *Id.* Dr. Stonnington observed a contusion and indicated Plaintiff would likely have symptoms for a couple of months, but would "have a complete recovery" from the injury and "have no long-term sequela." Tr. at 815. Dr. Stonnington had previously observed Plaintiff to have arthritis in the medial area of her right knee and a meniscal tear, and he performed total knee arthroplasty to address those impairments. *See* Tr. at 575. However, his December 2012 prognosis and opinion appear to be limited to Plaintiff's injury to the lateral side of her right knee that was sustained in the MVA, as reflected in his indications that Plaintiff would continue her home therapy program and follow up with him at the one-year mark from her total knee arthroplasty. *See id.* Furthermore, Dr. Stonnington had examined Plaintiff a month before; prescribed Naproxen, Lortab, and Flexeril, with five refills each; and instructed Plaintiff to obtain another prescription in six months and to attend a follow up visit in one year. Tr. at 810–11. Had Dr. Stonnington expected Plaintiff to completely recover and have no long-term sequelae from total right knee arthroplasty, it would have made little sense for him to prescribe Plaintiff a six-month supply of medications and indicate he would subsequently prescribe another six-month supply.

The undersigned finds that the ALJ considered and weighed the factors in 20 C.F.R. § 404.1527(c) in considering Dr. Stonnington's opinions. Contrary to Plaintiff's assertion, it appears the ALJ considered all of the relevant factors in 20 C.F.R. § 404.1527(c). *See* Tr. 23 (recognizing Dr. Stonnington's specialization as an orthopedist and discussing the length of Plaintiff's treating relationship with Dr. Stonnington), 24–25 (summarizing Plaintiff's treatment visits with Dr. Stonnington and other evidence of record regarding Plaintiff's right knee impairment, including MRI findings, and Plaintiff's treatment visits with Dr. Sumida), 28 (citing Dr. Stonnington's most recent findings in discussing the supportability factor), 31 (discussing Dr. Stonnington's physical findings and concluding that neither his findings nor the record as a whole supported his opinion). The ALJ did not reject Dr. Stonnington's August 2012 opinion merely because she found it to be in conflict with the December 2012 opinion. She rejected both opinions because she found that they conflicted with Dr. Stonnington's objective findings and the evidence as a whole. *See* Tr. at 31. Thus, she determined that the supportability and consistency factors weighed against Dr. Stonnington's opinion. She reached that conclusion because she found that "[t]he record demonstrates that the claimant's conditions have been treated successfully and they appear to be adequately controlled." Tr. at 28. She further concluded that "the record shows that the claimant should retain significant functional abilities despite her knee problems." *Id.*

Although this court is without authority to reweigh the opinion evidence, it cannot uphold the ALJ's weighing of that evidence if it was influenced by "means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517

(4th Cir. 1987). The ALJ cited medical evidence[4] in addition to Dr. Stonnington's December 2012 statement to support her conclusion, but it is unclear whether she would have reached the same conclusion regarding Plaintiff's functional abilities if she had considered that Dr. Stonnington's December 2012 opinion pertained only to the injury to the lateral side of Plaintiff's right knee. Dr. Stonnington's August 2012 opinion indicated Plaintiff's impairments were expected to last for at least 12 months, but the ALJ did not address this aspect of the opinion and, instead, determined that the December 2012 opinion suggested that the August 2012 opinion "was for a temporary disability that he expected would improve after surgery." *See* Tr. at 31. In addition, the ALJ failed to acknowledge evidence in the record that some of Plaintiff's symptoms would persist after surgery, including Dr. Stonnington's continuation of Plaintiff's prescription medications and Dr. Sumida's April 2012 indication that surgery was designed to treat the meniscal pathology, but would not cure Plaintiff's arthritis. *See* Tr. at 756, 811. Because Dr. Stonnington was Plaintiff's treating specialist, his opinion was entitled to substantial deference. *See* SSR 96-2p; 20 C.F.R. § 404.1527(c)(5). While the ALJ found that the supportability and consistency factors weighed against according significant weight to Dr. Stonnington's opinion, her conclusion appears clouded by a misinterpretation of the record and a failure to consider relevant evidence. Therefore, the undersigned

---

[4] The ALJ cited Plaintiff's indication to Dr. Stonnington at her six-week post-operative visit that she was doing well, had no complaints, and was happy with the results, as well as Dr. Stonnington's December 2012 observations that Plaintiff had normal gait, was ligamentously stable, had no more than mild deficits in ROM of the knee, and had no evidence of motor deficits in her right leg. Tr. at 25, 28.

recommends the court find the ALJ did not rely upon substantial evidence to support her decision to accord minimal weight the opinion of Plaintiff's treating orthopedic surgeon.

b.    Dr. Roberts' Opinion

The record contains work excuse slips from Dr. Roberts dated October 12, 2011, and February 29, 2012. Tr. at 409. The October 2011 excuse slip indicates Plaintiff was excused from work from September 23, 2011, through "ongoing unknown." *Id.* The February 2012, excuse slip indicates Plaintiff was excused from work due to injury for an "ongoing" period "pending completion of treatment plans of specialists." *Id.*

Plaintiff argues the ALJ neglected to consider the statements from Dr. Roberts excusing Plaintiff from work. [ECF No. 14 at 25–26]. The Commissioner argues the ALJ's failure to discuss the excuse slips from Dr. Roberts resulted in harmless error because Dr. Roberts provided an opinion on an issued reserved to the Commissioner that could have had no practical effect on the outcome of the case. [ECF No. 16 at 14–15].

The undersigned recommends the court find the ALJ erred in failing to consider and evaluate the work excuses from Dr. Roberts as medical opinion evidence. A medical opinion is a statement from a physician, psychologist, or other acceptable medical source that "reflects judgments about the nature and severity" of the claimant's impairments, including "symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, quoting 20 C.F.R. § 404.1527(a)(2). Dr. Roberts' work excuses qualify as medical opinions because they are statements that reflect Dr. Roberts' judgment that Plaintiff's impairments are severe enough to prevent her from working for an ongoing period. *See* Tr. at 409. The Social

41

Security Administration's ("SSA's") rules require that ALJs "always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner" and "evaluate every medical opinion" they receive. 20 C.F.R. § 404.1527(c); SSR 96-5p. Although the work excuses from Dr. Roberts contain very little detail and no explanation, those are factors that go to the weight to be accorded to them—not to whether they are considered at all. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). A finding that an ALJ's failure to consider a medical opinion was harmless error appears to be contraindicated by the SSA's requirements that ALJ's "always" consider "every" opinion. *See* 20 C.F.R. § 404.1527(c); SSR 96-5p. While the Commissioner may be correct that the ALJ would have rejected Dr. Roberts' opinion for the same reasons that she rejected Dr. Stonnington's opinion, it is also possible that she would have considered that Dr. Roberts' opinion was consistent with Dr. Stonnington's opinion or that it supported a closed period of disability. Therefore, the undersigned recommends a finding that the ALJ erred in failing to consider Dr. Roberts' excuse slips as opinion evidence and that her error was not harmless.

2.    Credibility

Plaintiff argues the ALJ did not properly consider her credibility, particularly with regard to her migraine headaches and her work history. [ECF No. 14 at 32–33]. The Commissioner maintains that the ALJ was not required to consider Plaintiff's work

history because Plaintiff left her full-time teaching position for non-medical reasons. [ECF No. 14 at 19–20].

An ALJ cannot base a finding that a claimant is disabled on the claimant's allegations of pain or other symptoms without record evidence of medical signs and laboratory findings that demonstrate the existence of a medically-determinable impairment that could reasonably cause the pain and symptoms reported. SSR 96-7p. The intensity, persistence, and functionally-limiting effects of a claimant's symptoms should only be considered after the claimant has established the existence of a medically-determinable impairment. *Id.* However, after establishing the existence of a condition reasonably likely to cause the alleged symptoms, the claimant may "rely exclusively on subjective evidence to prove the second part of the test." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). "[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. SSR 96-7p. To assess the claimant's credibility, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.*

If a claimant has a medically-determinable impairment that could reasonably cause the alleged pain or other symptoms, the ALJ cannot reject the claimant's testimony about her pain or other symptoms without providing an explanation that is supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

The ALJ found that Plaintiff's medically-determinable impairments could cause the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. at 28. She subsequently indicated that "the issue of credibility" could not "be discussed analytically in absolute terms, but must be measured by degree." Tr. at 31. She found Plaintiff's impairments could be expected to cause her some pain and to reduce her RFC, but would not be severe enough to prevent Plaintiff from performing some light work activity. Tr. at 31–32. She focused on Plaintiff's knee problems, but further found Plaintiff's credibility to be undermined by the fact that she stopped working as a teacher because of her husband's job transfer—not because of her impairments. Tr. at 28–29. She indicated Plaintiff's hearing testimony was inconsistent with the record evidence regarding her migraine headaches. Tr. at 30. She also found Plaintiff's hearing testimony

regarding her daily activities to be inconsistent with a function report dated October 2011. *Id.*

The undersigned recommends the court find the ALJ did not adequately consider the record evidence that was consistent with Plaintiff's testimony that migraine headaches would cause her to be absent from work frequently. The ALJ concluded Plaintiff's testimony was inconsistent with the evidence, but a review of the record suggests otherwise. Plaintiff testified that she experienced one to three migraines per week, which were exacerbated by poor sleep and worry. Tr. at 77. She stated her migraines could last for one to three days at a time, but were usually responsive to Imitrex. Tr. at 77. The record reflects several changes in Plaintiff's medications to address an increased frequency of headaches or side effects of medications. *See* Tr. at 399 (Inderal prescribed on August 29, 2011, because Elavil made Plaintiff sleepy), 395 (Depakote prescribed on September 29, 2011, because Inderal made Plaintiff drowsy when taken in the morning and gave her insomnia when taken at night), 391 (Topamax prescribed on October 13, 2011, because Depakote increased headaches), 387 (Topamax increased on December 21, 2011, because of increased headache intensity). As indicated by the ALJ, the record also reveals a decrease in the frequency of Plaintiff's migraines with use of Topamax, but, contrary to the ALJ's assertion, it still reflects that Plaintiff's headaches occurred with the frequency she alleged in her testimony. *See* Tr. at 586 (On July 31, 2012, Plaintiff informed Dr. Lyon that Topamax had decreased her headaches from between 10 and 12 to approximately eight per month), 610 (On December 19, 2012, Plaintiff indicated she was experiencing fewer than nine migraines per month). Although

Plaintiff indicated to Dr. Lyon in March 2013 that her migraines were fairly well-controlled as long as she reduced her family stress, Plaintiff had reported the month before that her headaches had increased. *Compare* Tr. at 819, *with* Tr. at 821. The record does not indicate that the reduction in migraines in March 2013 was to any fewer than the eight or nine per month that Plaintiff had reported in July and December 2012, and which were consistent with her testimony. For the foregoing reasons, the undersigned recommends the court find the ALJ did not carefully consider Plaintiff's statements about her symptoms with the rest of the relevant evidence in the case record in assessing Plaintiff's credibility.

The undersigned further recommends the court find the ALJ did not adequately consider Plaintiff's work history in assessing her credibility. A claimant's prior work record and efforts to work are among the evidence that may be relevant to the credibility assessment. SSR 96-7p. Although the ALJ considered Plaintiff's prior work record to the extent that she concluded Plaintiff stopped working as a teacher because of her husband's job transfer, she failed to consider Plaintiff's significant work history as an element that bolstered her credibility. *See* Tr. at 72 (Plaintiff testified she worked as a teacher for 26 years in Greene County, Mississippi), 96 (Plaintiff testified she worked as a teacher for a total of 28 to 29 years, including work as a substitute teacher during her last year of work), 161–62 (substantial earnings between 1983 and 2009), 163–65 (employment with "County of Greene" through 2009). In *Vitek v. Finch*, 438 F.2d at 1159, the Fourth Circuit indicated "there can be no question about the motivation to work of a man who worked for the same employer for 37 years." In *Osgood v. Astrue*, 2:08-3386-DCN, 2010

WL 737839, at *8 (D.S.C. Mar. 2, 2010), this court relied upon the Fourth Circuit's language in *Vitek* and non-binding precedent from other jurisdictions to find the ALJ's failure to consider the plaintiff's substantial work history rendered the credibility assessment incomplete. The court indicated "[i]f a claimant has a good employment history, she is entitled to substantial credibility with regard to her disability and the reasons she gives for no longer being able to work." *Id.*, citing *Carrillo v. Heckler*, 599 F.Supp. 1164, 1170 (S.D.N.Y. 1984); *Vitek*, 438 F.2d at 1159; *Phares v. Commissioner of Social Security*, C/A No. 3:07-90, 2008 WL 2026097, *13 (N.D.W.Va. May 9, 2008); *Nanny v. Mathews*, 423 F.Supp. 548 (E.D.Va. 1976). Here, Plaintiff had a lengthy work history, which included 28 to 29 years as a teacher and 26 of those years with the same employer. Such a work history "entitled" Plaintiff to "substantial credibility," and the ALJ erred in failing to consider it as part of the credibility determination. *See Osgood*, 2010 WL 737839, at *9.

Because the ALJ did not adequately consider Plaintiff's substantial work history and statements regarding migraine headaches, the undersigned recommends the court find she erred in assessing Plaintiff's credibility.

### 3.    RFC Assessment

Plaintiff argues the ALJ did not explain her RFC assessment as required by SSR 96-8p. [ECF No. 14 at 26]. She specifically maintains the ALJ did not consider her difficulty ambulating and need for an assistive device. *Id.* at 27. She also contends the ALJ failed to explain how her RFC finding was based on all the relevant evidence. *Id.* at 29. She argues the ALJ failed to consider her ability to work on a sustained basis and,

47

instead, relied on occasional periods of improved symptoms to support her finding that Plaintiff was not disabled during a possible closed period. *Id.* at 30. She further maintains the ALJ did not consider all of her impairments in concluding that she was able to work during the relevant period. *Id.* at 31–32.

The Commissioner argues the ALJ adequately addressed Plaintiff's functional limitations in concluding that Plaintiff had the RFC for light work with postural and manipulative limitations. [ECF No. 16 at 16]. She maintains the record did not document that Plaintiff regularly required use of a cane. *Id.* at 17. She contends the ALJ considered the entire record and adequately supported her conclusion that Plaintiff's statements were not entirely credible. *Id.* at 18–19.

To assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the claimant's impairments and determine her work-related abilities on a function-by-function basis. SSR 96-8p. This ordinarily requires that the ALJ consider the claimant's ability to sustain work-related activities over an eight hour day and five-day work week or an equivalent work schedule. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also explain how any material inconsistencies or ambiguities in the record were considered and resolved. *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably

attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations, if available. *Id.* The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the physical RFC to perform light work that included frequently handling and fingering with the bilateral upper extremities; occasionally reaching overhead, balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; and no climbing of ladders, ropes, or scaffolds. Tr. at 23. She found that Plaintiff had the mental RFC to perform simple and low-level detailed tasks, to have superficial contact with the public, and to adapt to gradually-introduced or infrequent changes in the work place, but should avoid customer service, sales, or counter work. *Id.* She found that Plaintiff was not disabled as a result of her mental problems because she obtained only minimal treatment and did not obtain treatment from a mental health specialist. Tr. at 27, 29. She assessed no greater limitations from Plaintiff's degenerative disc disease because Plaintiff received conservative treatment, failed to frequently report back or neck problems, demonstrated no evidence of sensory or motor deficits, and had no central canal stenosis and only mild neural foraminal stenosis. Tr. at 29. She found that the record suggested Plaintiff's carpal tunnel syndrome responded well to hand splinting and did not prevent her from performing regular handling and

fingering. *Id.* She determined that Plaintiff's migraine headaches were controlled and did not occur with such frequency or intensity as to preclude her from working. *Id.*

The ALJ also considered whether the record supported a closed period during which Plaintiff's right knee injury precluded her from working. Tr. at 28. However, she provided the following explanation for her conclusion that the record did not support a closed period of disability:

> The record shows that the claimant experienced the right knee injury during the motor vehicle accident in June 2011. However, by November 2011, she reported that she was having only occasional pain in the knee, and her physician noted that she maintained good range of motion (Exhibit 9F, p. 5). In December 2011, she reported that she reinjured her knee in a fall. However, as of February 2012, she reported that she was able to ambulate with a knee brace and her physical examination showed that she was neurovascularly intact (Exhibit 9F, p. 7). During the period after December 2011, there is no objective evidence to suggest that she would have been unable to perform light work as defined herein for at least a 12-month period of time.

Tr. at 28–29.

The undersigned recommends a finding that the ALJ did not adequately assess Plaintiff's RFC based on all the relevant evidence in the record. As discussed above, the ALJ failed to resolve ambiguities in the record regarding Plaintiff's use of a cane to ambulate and did not include in her RFC assessment a provision for use of a cane. The ALJ also concluded that Plaintiff was able to perform light work, which by definition requires "a good deal of walking or standing," despite the fact that Plaintiff's treating orthopedist indicated Plaintiff could do no long-term standing or walking. *See* 20 C.F.R. § 404.1567(b); *see also* Tr. at 579–80. She found Plaintiff was not disabled for a closed period without considering Dr. Stonnington's indication that Plaintiff's limitations would

50

preclude work for a period of 12 months or more and without considering Plaintiff's other impairments, including frequent migraine headaches. *See* Tr. at 579–80. The ALJ did not consider the consistency of the record with Plaintiff's testimony regarding the frequency of her migraines and did not assess Plaintiff's credibility in light of her substantial work history. In light of these errors, the undersigned recommends a finding that the RFC assessed by the ALJ does not reflect careful consideration of the record and is unsupported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 29, 2015                    Shiva V. Hodges
Columbia, South Carolina             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation"**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).